# FOR PUBLICATION



FILED
Dec 16 2014, 12:47 pm

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**BROOKE N. RUSSELL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHY BRADLEY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE PATERNITY OF T.H., | ) |
| | ) |
| TYRONE HUTCHINS, JR., | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | )  No. 84A05-1404-JP-161 |
| | ) |
| KELLISHIA KELLY, | ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE VIGO CIRCUIT COURT
The Honorable David R. Bolk, Judge
The Honorable Daniel W. Kelly, Magistrate
Cause No. 84C01-0205-JP-439

**December 16, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Respondent, Tyrone Hutchins (Father), appeals the trial court's denial of his Petition to Rescind or Vacate Paternity Affidavit.

We affirm.

## ISSUE

Father raises one issue on appeal, which we restate as follows: Whether the trial court abused its discretion when it denied Father's Petition seeking to rescind or vacate the paternity affidavit which he executed when he was a minor.

## FACTS AND PROCEDURAL HISTORY

On September 21, 1998, Appellee-Petitioner, Kellishia Kelly (Mother), gave birth to T.H. The following day, Father visited Mother at the hospital. Father had engaged in sexual relations with Mother and believed himself to be the father of T.H. Father was "excited" and wanted "to see the baby." (Transcript p. 19). While visiting Mother in the hospital, Father was given a paternity affidavit by a nurse. Father signed the affidavit, affirming to be T.H.'s natural father. At the time of executing the affidavit, Father was seventeen years old, in foster care, and resided in a group home.

On March 8, 2000, the trial court conducted a hearing on a petition for insurance and Medicaid reimbursement. On November 17, 2000, following a hearing on Father's petition for visitation, the trial court granted Father "visitation with the minor child." (Appellant's App. p. 2). On May 10, 2002, Mother filed a petition to establish support. On July 17, 2002, the trial court conducted a hearing on Mother's petition and ordered Father to pay support in the weekly amount of $75. Mother continued to have physical

2

custody of T.H., while Father was awarded "the right to reasonable visitation." (Appellant's App. p. 5). Thereafter, on August 23, 2004, the trial court heard Mother's petition on visitation and did not enter an order "as the [F]ather did not indicate that he desires to visit with his son." (Appellant's App. p. 5). In February 2008, Father sent a letter to the trial court requesting a paternity test, which was denied by the trial court in August 2008, noting that Father "signed the paternity affidavit on 9/22/98, nearly 10 [years] ago. It is too late for [Father] to be attempting to challenge the affidavit. Indiana case law is clear that [F]ather may not undo his paternity." (Appellant's App. p. 7). On September 27, 2012, Father appeared before the trial court on the State's petition for rule to show cause. During the hearing, Father agreed to pay weekly child support of $75, increased by $30.00 per week toward the accrued support arrearage. In March 2013, the parties appeared at a hearing where Father was ordered to obtain part-time employment and pay the court ordered child support. On May 20, 2013, Father filed a petition to modify child support. Eight days later, on May 28, 2013, the trial court reduced his payment toward the accrued support to $5.00 per week but affirmed its weekly child support order.

On September 14, 2013, Father filed his Petition to Rescind or Vacate Paternity Affidavit, asserting coercion, duress, and mistake of fact during the signing of the paternity affidavit at the time of T.H.'s birth. On October 3, 2013, following a hearing, the trial court denied Father's Petition, concluding

> While the court is concerned about the alleged circumstances under which [Father] signed the paternity affidavit following the child's birth, and believes that such circumstances may have justified the ordering of

3

paternity testing at an earlier date, the court finds that far too much time has passed between the signing of the paternity affidavit in September of 1998 and the present. The juvenile magistrate listened to a recording of the hearing which occurred on August 1, 2002, when custody and support orders were first entered by the court. No mention of DNA testing or any issue of Father's paternity was raised at that time, which was four years after the paternity affidavit was signed, The first request for DNA testing in this case occurred in 2008. In addition, and more importantly, the court finds that Father did indeed affirmatively ratify the paternity affidavit when, on October 2, 2000, . . . , Father filed a request for a hearing to help resolve problems with visitation. At a hearing on November 17, 2000, the court awarded Father parenting time in accordance with the guidelines[.]

(Appellant's App. p. 37).

On October 29, 2013, Father filed a motion to correct error. On March 13, 2014, after conducting a hearing, the trial court denied Father's motion, finding

In addition to the reasoning set forth in the court's order of October 3, 2013, the court would point out that in sworn testimony, Father acknowledged that he and Mother had had sexual intercourse and that he believed himself to be the [F]ather of the minor child when he signed the affidavit. He did not testify to any facts that would cast doubt on his original belief regarding paternity. Mother testified that he is the biological father of the child. The [F]ather did not cite any legal authority from Indiana or any other jurisdiction allowing the court to order DNA testing under the circumstances of this case, and the court was unable to find any such authority in its own review of the law.

While the Father's circumstances as a 17-year-old foster child, who signed the paternity affidavit without the presence of a parent or guardian, were less than ideal, those circumstances do not, *ipso facto*, establish grounds for the relief here requested, particularly at this late date and after the intervening hearings on custody and support when Father was 20 years, 11 months old, and on Father's request for a visitation order when Father was 19, which operated as a ratification of the paternity affidavit at issue.

(Appellant's App. pp. 42-43).

Father now appeals. Additional facts will be provided as necessary.

### DISCUSSION AND DECISION

4

Father contends that the trial court abused its discretion when it denied his motion to correct the trial court's erroneous order denying his Petition to Rescind or Vacate Paternity to T.H.

The trial court's decision on a motion to correct error comes to an appellate court cloaked in a presumption of correctness, and the appellant has the burden of proving that the trial court abused its discretion. *Petersen v. Burton*, 871 N.E.2d 1025, 1028 (Ind. Ct. App. 2007). A trial court abuses its discretion when its judgment is clearly against the logic and effect of the facts and circumstances before it or where the trial court errs as a matter of law. *See Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013). When the trial court enters findings *sua sponte*, the specific findings will not be set aside unless clearly erroneous. *Id.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom which support it. *Id.* We neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* We consider only the evidence and reasonable inferences drawn therefrom that support the findings. *Id.* We review the trial court's legal conclusions *de novo*. *Id.*

The Indiana Code has no provision for the filing of an action to disestablish paternity. *In re Paternity of H.J.B.*, 829 N.E.2d 157, 159 (Ind. Ct. App. 2005). Rather, the Indiana statutes governing paternity actions provide a means to establish paternity, not to disestablish it. *Id.* At the time Father executed the paternity affidavit, the Indiana statute provided two ways to establish paternity: "(1) in an action under [article 14 governing proceedings for establishing paternity] or (2) by executing a paternity affidavit in accordance with I.C. § 16-37-2-2.1." Ind. Code § 31-14-2-1(1998). "Immediately

5

before or after the birth of a child who is born out of wedlock, a person who attends or plans to attend the birth, including personnel of all public or private birthing hospitals, shall:  (1) provide an opportunity for:  (A) the child's mother; and (B) a man who reasonably appears to be the child's biological father; to execute an affidavit acknowledging paternity of the child[.]"  I.C. § 16-37-2-2.1(1998).  Any request for genetic testing must be made within sixty days after a paternity affidavit is executed.  *See* I.C. § 16-37-2-2.1(k)(1998).  "A paternity affidavit that is properly executed [] may not be rescinded more than sixty (60) days after the paternity affidavit is executed except in cases of fraud, duress, or material mistake of fact."  I.C. § 16-37-2-2.1(i)(1998).

Because the sixty days to request genetic testing and to rescind the paternity affidavit have well passed, Father focuses on the duress and mistake of fact prong of the statute in an attempt to rescind the affidavit establishing his paternity of T.H.  Specifically, he asserts that, at the time of signing, he was a minor, acting without legal representation, and was put under duress by Mother and the child's maternal grandmother (Grandmother).

Father testified that in September 1998, when executing the paternity affidavit, he was seventeen years old.  He was in a foster home, and no parent or guardian was present when he visited Mother and T.H. in the hospital.  He was excited and wanted to see the baby; Father readily admitted to having engaged in sexual intercourse with Mother.  He stated that, during the visitation, a nurse handed him the paternity affidavit to sign.  He believed that signing the affidavit merely would give the child his last name.  Father testified that at the time he "actually signed the affidavit," Mother and Grandmother told

6

him that he would never see T.H. if he "didn't man up and do what [he] was supposed to do. And that they'd go to the group home; run to the news and tell them I'm a child in the group home that had sex with her daughter, and she'd get the group home closed down and things like that." (Tr. p. 27).

Furthermore, while acknowledging that the current statute with regard to the execution of paternity affidavits is not applicable, Father claims that a special consideration should be made for him as a subsequent "change in the law [] highlights the problematic and coercive situation [Father], a minor, was operating under[.]" (Appellant's Br. p. 9).

The current statute reads that

An individual who is (1) a (A) child's mother; or (B) person identified as the father []; and (2) less than eighteen (18) years of age; must have an opportunity to consult with any adult chosen by the individual regarding the contents of a paternity affidavit before signing the paternity affidavit under this section. A signed paternity affidavit is voidable if the individual does not have the opportunity to consult with an adult chosen by the individual.

I.C. § 16-37-2-2.1(t)(1).

Nevertheless, without finding the current statute to be applicable, we note that Mother's testimony at the hearing dispels Father's contentions that he was unaware of what he was signing and did not have an opportunity to consult with a parent or guardian. Mother testified that upon handing Father the paternity affidavit for his signature, the nurse explained "everything" to "both of them." (Tr. p. 28, 30). Also, Mother clarified that prior to signing, Father telephoned his mother and stated to her that "Mom, I know

the child is mine, I don't care what you say and I'm going to sign the papers." (Tr. p. 28).

Time and again, we have emphasized that allowing a party to challenge paternity when the party has previously acknowledged himself to be the father should only be allowed in extreme and rare circumstances. *In re Paternity of R.C.*, 587 N.E.2d 153, 157 (Ind. Ct. App. 1992). This is not one of those circumstances. At no point during the proceedings does Father enunciate a belief that he is not T.H.'s biological father. Even though he unsuccessfully requested a paternity test in 2008, when the child was nine years old, Father never once stated that he doubted T.H.'s paternity. Rather, he readily admitted to having had sexual relations with Mother and, at the time of the birth, clearly fostered no doubt that he was the child's biological father. Moreover, it was Father who took the initiative in November 2000, to request court-ordered visitation. Despite numerous court appearances since 2000, Father did not raise the issue of rescinding the paternity affidavit until September 14, 2013—curiously after all his requests for modification of child support fell for naught. Stripped to its bare essence, Father's argument boils down to an invitation to reweigh his and Mother's credibility and to find in his favor—this task which is not reserved for us.[1] We affirm the trial court.

## CONCLUSION

---

[1] We disagree with Father's analogy of his situation to *J.M. v. M.A.*, 950 N.E.2d 1191, 1191 (Ind. 2011), in which J.M. and mother began a relationship when mother was already four months pregnant. Our supreme court remanded for paternity testing because a material mistake of fact might have existed at the time J.M. signed the paternity affidavit. *Id.* at 1193. Not only did J.M. testify that he signed the affidavit when he was a minor and under a belief that he was doing so to enable a guardianship to be established, mother also testified that J.M. was not the child's father, a fact which was conceded by the State. *See id.* Here, neither Mother nor the State made a similar concession.

8

Based on the foregoing, we conclude that the trial court did not abuse its discretion in denying Father's Petition to Rescind or Vacate Paternity Affidavit.

Affirmed.

VAIDIK, C. J. and BAKER, J. concur